**In re KAR DEVELOPMENT ASSOCIATES, L.P., Debtor.**

**Bankruptcy No. 93–22056–11.**

United States Bankruptcy Court, D. Kan.

Aug. 5, 1994.

598

R. Pete Smith and Jonathan A. Margolies of McDowell, Rice & Smith, Kansas City, MO, for debtor KAR Development Associates, L.P.

Mark A. Shaiken, Irvin C. Ness and Cindi S. Woolery of Stinson, Mag & Fizzell, Kansas City, MO, for Alchemedes/Olathe Inn Ltd. Partnership, City of Olathe, Kan., and Sec. Bank of Kansas City.

David W. Queen of Gilmore & Bell, Kansas City, MO, for City of Olathe, Kan.

### MEMORANDUM OPINION

JOHN T. FLANNAGAN, Bankruptcy Judge.

The Kansas Economic Development Revenue Bond Act[1] empowers a city "to issue revenue bonds, the proceeds of which shall be used for the purpose of paying all or part of the cost of purchasing ... facilities for ... commercial development"[2] and "to enter into leases or lease-purchase agreements with any person, firm or corporation for such facilities."[3]  A city exercises the power by

---

1. K.S.A. §§ 12–1740 to 12–1749a, inclusive, as amended. The acronym for the Kansas statute would be "EDRB" or the shortened version, "EDB." Bonds issued under similar state statutes are often referred to as Industrial Development Revenue Bonds ("IDBs") and Industrial Revenue Bonds ("IRBs") within the industry. This opinion will use the acronym "IRB" because it seems to be the most commonly used term in everyday speech.

2. K.S.A. § 12–1740.

3. K.S.A. § 12–1740.

ordinance,[4] but it cannot "contract or ... incur any obligation of any kind or nature except such as shall be evidenced by the issuance of revenue bonds payable solely out of the rentals received from such facilities."[5] The statute requires a city to file a statement with the Board of Tax Appeals of such a proposed bond issue containing "[t]he name of the city ... proposing to issue the revenue bonds, the lessee, the guarantor, if any, the paying or fiscal agent, the underwriter, if any, and all attorneys retained to render an opinion on the issue."[6] If a city has issued revenue bonds under the statute, it "may issue refunding revenue bonds, in the manner prescribed by ... K.S.A. 10–116a, to refund any previous issue...."[7]

Typically, a city and a developer agree upon the facility to be constructed. The developer agrees to pay for part of the cost of the project. The city passes an ordinance issuing the revenue bonds, which are sold to an institutional investor rather than to the public at large. The developer's investment and the bond proceeds are used to purchase the required land and improvements for the planned facility. The developer conveys the land to the city which leases the facility back to the developer until the bonds are paid, at which time the tenant can exercise an option to purchase the property for a nominal amount. In this way, the project stands as security for the repayment of the bonds. The ordinance appoints a fiscal agent for the bondholder who for a fee agrees to receive and pay the rental income to the bondholder, keep records, and hold any collateral that might be involved. Often a third party agrees with the tenant/developer to pledge property as collateral for the bonds in return for a fee. This general pattern was followed in this case.

KAR Development Associates, L.P. ("KAR" or "debtor"), a Kansas limited partnership, operates a Holiday Inn Hotel on the south side of the City of Olathe, Kansas. The City of Olathe ("City") issued industrial revenue bonds to finance part of the construction of the hotel. Merrill Lynch pur-

chased the bonds. The City took title to the hotel and leased it to KAR as the IRB statute requires.

Security Bank of Kansas City ("Security") is the fiscal agent for the bondholder.

Anchor Savings Association ("Anchor"), a local Kansas savings and loan, pledged certain securities as collateral for the bonds under an agreement with the debtor. The agreement made the pledged securities the primary collateral for the bond debt, putting them ahead of the hotel property.

Alchemedes/Olathe Inn Limited Partnership ("Alchemedes") now owns the revenue bonds, having acquired them from the Resolution Trust Corporation ("RTC"). RTC entered the picture when it was appointed receiver of Anchor Savings and assumed its operation. As receiver of Anchor, RTC purchased the revenue bonds from their original holder, Merrill Lynch, also acquiring the bondholder's lien against securities Anchor had pledged as the primary collateral for the revenue bonds. RTC appropriated the pledged collateral securities for itself and offered the revenue bonds for sale based on the value of the hotel which remained as the only bond collateral. Alchemedes bought the bonds and now seeks to evict KAR under the IRB lease. In a general sense, there is no dispute that the hotel property stands as collateral for the bonds, but the legal form and nature of that security is contested by the parties.

Debtor KAR Development Associates, L.P., appears by its attorneys, R. Pete Smith and Jonathan A. Margolies of the firm of McDowell, Rice & Smith, P.C., Kansas City, Missouri. Alchemedes/Olathe Inn Limited Partnership, the City of Olathe, and Security Bank of Kansas City (collectively "the movants") appear by their attorneys, Mark A. Shaiken and Cindi S. Woolery of the firm of Stinson, Mag & Fizzell, Kansas City, Missouri. David W. Queen of the firm of Gilmore & Bell, Kansas City, Missouri, also appears for the City of Olathe, Kansas.

---

**4.** K.S.A. §§ 12–1741 and 1743.

**5.** K.S.A. § 12–1743.

**6.** K.S.A. § 12–1744a.

**7.** K.S.A. § 12–1749a.

## PROCEDURAL HISTORY

The litigation began when Alchemedes/Olathe Inn Limited Partnership, the City of Olathe, Kansas, and Security Bank of Kansas City[8] joined in filing an involuntary Chapter 11 petition against the debtor, KAR Development Associates, L.P., in the United States Bankruptcy Court for the District of Kansas, Topeka Division, on October 21, 1993.[9] The record shows that Alchemedes instigated the action. Before the City and Security would sign the involuntary petition, they required Alchemedes to agree in writing to indemnify them against any liability arising from the filing of the involuntary petition.[10] KAR responded to the petition on October 25, 1993, by filing a voluntary Chapter 11 petition here in the Kansas City, Kansas, Division of the Court.

The involuntary case was assigned to The Honorable James A. Pusateri, Chief Bankruptcy Judge. Judge Pusateri held a hearing on November 4, 1993, and ordered the involuntary case transferred from Topeka to the Kansas City, Kansas, Division of the Court. His order directed that the voluntary case proceed and that the involuntary case remain pending in the event its filing date should become relevant under any applicable section of the Bankruptcy Code. So far, all activity involves only this voluntary case.

The next procedural event occurred on November 5, 1993, when Alchemedes, the City, and Security filed their joint motion for relief from the automatic stay to obtain possession of the hotel property. Realizing that success on the motion for stay relief would depend on the legal classification of the industrial revenue bond transaction, the moving parties sought an expedited decision on the issue by filing a Motion for Partial Summary Judgment on November 23, 1993.

Debtor objected to the Motion for Partial Summary Judgment, and the Court scheduled oral argument for December 16, 1993. At the conclusion of the hearing, the Court denied the Motion for Partial Summary Judgment and stay relief, directing that the parties complete discovery and prepare a pretrial order.

Following approval of the pretrial order, the parties presented evidence on May 19, 20, and 23, 1994. They stipulated Movants' Exhibits 1 through 38 and Debtor's exhibits A through L into evidence. Each side called witnesses who testified about the history and legal structure of the hotel project and the effect that a ruling favorable to debtor would have on the future sale of revenue bonds in Kansas.

At the conclusion of the hearing, Mr. Smith requested leave to obtain a transcript of witness Dennis Mitchell's testimony for use in preparing debtor's suggested findings of fact and conclusions of law. Mr. Shaiken agreed for the movants and the Court allowed the request. The parties' post-trial submissions refer to Mr. Mitchell's testimony and the last section of this opinion contains footnote references to the partial transcript.

The parties have stipulated in the pretrial order that the Court has jurisdiction over the parties and subject matter of the action; that venue in this district is proper; that all necessary and indispensable parties are joined; and that the Court can try this proceeding to final judgment. The Court finds independently of the stipulation that it has jurisdiction under 28 U.S.C. §§ 1334 and 157 and the general reference order of the District Court effective July 10, 1984 (D.Kan.Rule 705).

Alchemedes, the City of Olathe, Kansas, and Security Bank of Kansas City have each filed proofs of claim. Alchemedes' claim no. 16 for $902,146.63 reserves the right to amend if the claim is determined to be a mortgage. Security's claim no. 15 for $1,089,000.00 was amended by claim no. 22 for $1,329,850.00 to include additional amounts due under a deferral agreement. Security's claims are also designated as secured and reserve the right to amend if held not to be rents under the lease. The City of

---

8. The evidentiary documents sometimes refer to Security National Bank of Kansas City, but most delete the word "National."

9. Case No. 93–41723–11.

10. One wonders whether this practice flies in the face of 11 U.S.C. § 303(i), the ostensible purpose of which is to discourage bad faith filings of involuntary petitions.

Olathe's claim no. 17 for $33,444.50 of payments in lieu of taxes and $6,000,000.00 of bond debt is marked secured and also reserves the right to amend if the lease is deemed to be a mortgage. The new bondholder, Alchemedes, is the principal interested party since the risk to the interests of the City and Security is minor.

The question for decision is whether Alchemedes' claim is for rent under a lease arising from the revenue bond transaction or whether in reality it is a secured claim subject to restructuring because it arises from a security agreement as defined by the Code.[11] The underlying question is whether the hotel is property of the bankruptcy estate. In any event, this is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (B), (G), (K), (M), and (O).

### BOND ISSUE HISTORY

The first witness at the hearing was Joe Ross, an experienced hotelier in the Kansas City area, who later became the general partner of KAR. In 1982, officials of the City of Olathe approached Mr. Ross and his partners about constructing and operating a hotel in the City, offering the possibility of financing through issuance of revenue bonds. Olathe officials wanted a full service hotel that would accommodate community functions. Mr. Ross and his partners engaged the investment firm of Laventhol & Horowitz to study the idea. After reviewing various financing options for the project, the group concluded that financing through revenue bonds was the most favorable approach since it offered a lower interest rate than was available through conventional financing and provided certain tax advantages.

The group developed a hotel proposal in conjunction with Anchor Savings Association, a Kansas savings and loan willing to pledge collateral as primary security for the bonds in return for a fee. The development group submitted its proposal to the City which eventually approved the issuance of revenue bonds to finance the project. KAR Development Associates, L.P., was formed as a Kansas limited partnership and funded by the private placement of partnership units issued on February 23, 1983.[12] KAR capitalized by selling partnership units for $2,645,000.00 which it invested in the hotel project.[13]

The City of Olathe passed Ordinance No. 83–21,[14] on March 29, 1983, authorizing the issuance of $6,000,000.00 in revenue bonds, the proceeds to be used for the hotel's construction. The ordinance sets out the form of the bonds;[15] authorizes a lease from the City to KAR;[16] consents to an assignment of KAR's leasehold interest to Anchor;[17] approves a pledge agreement of Anchor's collateral to Security;[18] and gives the bondholder the right to sue the City and the tenant (KAR) to enforce the bonds.[19]

Acting as General Partner of KAR, Ross purchased 12 acres in south Olathe for $350,000.00 in April 1983 and transferred title to the City.

As permitted by the ordinance,[20] the City and KAR entered into a "lease"[21] with a 24-year term and an option to extend for four periods of five years each.

---

11. Security agreement and other related terms are defined at § 101 of the Code as follows: " '[S]ecurity agreement' means agreement that creates or provides for a security interest" 11 U.S.C. § 101(50); " 'security interest' means lien created by an agreement" 11 U.S.C. § 101(51); " 'lien' means charge against or interest in property to secure payment of a debt or performance of an obligation" 11 U.S.C. § 101(37); " 'debt' means liability on a claim" 11 U.S.C. § 101(12); " 'claim' means (A) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured" 11 U.S.C. § 101(5).

12. Movants' Exhibit 5.

13. Debtor's Exhibit F.

14. Movants' Exhibit 6.

15. Movants' Exhibit 6, Section 9, at 19.

16. Movants' Exhibit 6, Section 28, at 55.

17. Movants' Exhibit 6, Section 28, at 55.

18. Movants' Exhibit 6, Section 29, at 55.

19. Movants' Exhibit 6, Section 19, at 46.

20. Movants' Exhibit 6, Section 28, at 55.

21. Movants' Exhibit 7.

The lease fixes payments in lieu of taxes for the first four years of its term, and schedules payments at $58,300.00 for 10 years thereafter.[22] It also ties rent payments to the City's obligation under the bonds. KAR is obligated to pay monthly payments in the amount of "[o]ne-sixth (⅙) of the interest coming due on the bonds on the next March 1 ... or September 1,"[23] and "[o]ne-twelfth (1/12) of the principal coming due ... on the Bonds."[24] The rent payments must continue "until the principal of and interest on the Bonds shall have been fully paid,"[25] but KAR's rent obligation is reduced if it acquires any of the outstanding bonds. Anchor is given veto rights over assignment of debtor's leasehold interest.[26] Anchor has the right to have the property conveyed to it, rather than to KAR, if the pledged collateral is used to pay the bonds.[27]

The pledged collateral referred to in the lease is the subject of a Collateral Pledge Agreement.[28] This agreement grants Security National Bank of Kansas City, the trustee and fiscal agent appointed in the ordinance, a lien in collateral consisting of two Federal Home Loan Mortgage Corporation ("FHLMC") Certificates said to be worth a total of $7.5 million. They are described in Exhibit A to the Collateral Pledge Agreement as[29]:

> One (1) $5,000,000 face amount FHLMC Mortgage Participation Certificate, dated as of October 1, 1982, Final Payment Date April 1, 2011, Certificate Rate 10.000%, Group No. 18–000001–643, Series No. 700. One (1) $5,000,000 face amount FHLMC Mortgage Participation Certificate, dated as of October 1, 1982, Final Payment Date April 1, 2011, Certificate Rate 10.000%, Group No. 18–000001–643, Series No. 700.

The Collateral Pledge Agreement secures a Reimbursement Agreement. By the terms of the Reimbursement Agreement[30] dated March 1, 1983, KAR is obligated to reimburse Anchor for the value of the $7.5 million of pledged collateral if Security Bank applies the collateral to the bond debt. This obligation is in turn secured by an Assignment of Lease and Security Agreement[31] dated March 1, 1983, between KAR, assignor, and Anchor, assignee. The Assignment of Lease states: "Assignor hereby assigns, grants and mortgages to Assignee any fee simple interest or any other interest or estate which Assignee (sic) may hereafter acquire in all or any part of the Project...."[32]

The hotel opened for business on October 4, 1983. It operated with difficulty, however, because of road construction interference, signage problems with the City, and delay in the opening of the new Olathe Medical Center on adjoining property. The Medical Center had been forecast to produce a demand for hotel beds for family and friends visiting hospital patients.

Ultimately, on March 1, 1987, anticipating its default on the lease payments, KAR signed a Deferral Agreement[33] with Bank of New York, The Chase Manhattan Bank, and Security Bank of Kansas, with the consent and approval of Anchor Savings Association, and the City of Olathe, Kansas. Bank of New York and The Chase Manhattan Bank were trustees for bondholders Municipal Investment Trust Fund 269th Monthly Payment Series and 270th Monthly Payment

---

22. Movants' Exhibit 7, Section 5.6, at 19.

23. Movants' Exhibit 7, Section 2.1(a), at 6.

24. Movants' Exhibit 7, Section 2.1(a), at 7.

25. Movants' Exhibit 7, Section 2.1, at 6.

26. Movants' Exhibit 7, Section 8.1, at 22.

27. Movants' Exhibit 7, Section 17.6, at 31.

28. Movants' Exhibit 9.

29. The Court cannot explain the variance between the $7.5 million value given to the pledged collateral in testimony and other exhibits and the $10 million total face amount of the Participation Certificates described here, nor can the Court be certain that Exhibit A to the Collateral Pledge Agreement duplicates the certificate information correctly since both descriptions are identical.

30. Movants' Exhibit 10.

31. Movants' Exhibit 8.

32. Movants' Exhibit 8, para. 1(b), at 2.

33. Movants' Exhibit 14.

Series, respectively.[34] The agreement reduced the interest rate to 9 percent and deferred bond interest in consideration for a 3 percent default premium on the bonds. The deferred interest, cumulative interest, and premium were secured by a Second Assignment of Lease and Security Agreement[35] which was subordinate to the first Assignment and to debtor's obligation under the Reimbursement Agreement with Anchor.

To effect the Deferral Agreement, KAR borrowed an additional $875,000.00 from Olathe Hotel Venture Partners, giving as collateral a security interest in the hotel furniture, fixtures and equipment.[36] KAR used the loan proceeds as additional capital for the hotel operation,[37] making KAR's total capital contribution to the project $3,520,000.00.

Although the evidence does not show precisely when RTC was appointed receiver for Anchor, it was probably in 1989 or 1990. According to the testimony of Mr. Ross, at some point KAR approached RTC about settling its debt, but RTC refused to negotiate because the bond debt was not in default. Finally, to induce RTC to consider settlement, KAR stopped paying on the bonds. KAR advised RTC that it was in default and wanted to discuss settlement. RTC again refused discussions because it had applied a $500,000.00 reserve to bring the debt current.

On February 13, 1992, RTC purchased the outstanding revenue bonds from Bank of New York and The Chase Manhattan Bank, N.A.,[38] paying $3,694,087.50 for Cert. # R–2 and $2,730,412.50 for Cert. # R–3.[39] This purchase gave RTC the bondholders' security interest in the two FHLMC Mortgage Participation Certificates that were worth $7.5 million when originally pledged as the primary collateral for the revenue bonds.

After taking no action to collect "payments in lieu of taxes" due since 1987, on July 6, 1992, the City issued a "Notice of Default and Demand for Payment" to KAR and RTC (in place of Anchor).[40] KAR negotiated an extension agreement with the City in consideration for the payment of $64,000.00, but it failed to make the payment within the extended time. According to the testimony, the balance of the delinquent payments in lieu of taxes was paid by RTC.

In August or September 1992, RTC sold the FHLMC Certificates. The record does not show whether RTC recovered all or only part of the original $7.5 million value of these certificates by the sale.

Having stripped the revenue bonds of their primary collateral backing, the FHLMC Certificates, RTC finally solicited KAR for a proposal to compromise the Holiday Inn bond debt on December 8, 1992.[41] KAR replied on December 18, 1992, offering to pay $2,880,000.00 for the bonds and the hotel property.[42] On February 10, 1993, Mr. Ross wrote again to the RTC's representative.[43] In this letter, Mr. Ross recapped the negotiations between KAR and RTC since his December 18, 1992, offer. He protested RTC's delay and rejection of the offer, as well as RTC's rejection of a revised cash offer that KAR had made to settle its debt.

Ignoring the protest, RTC sold the bonds to Alchemedes for $2,288,000.00 in a portfolio auction on September 1, 1993. For sale purposes, RTC valued the bonds based on the

---

34. Presumably, the trustees are somehow affiliated with Merrill Lynch which, according to the testimony, was the original bond purchaser. The evidence, however, does not show the connection.

35. Attached as Exhibit C to Movants' Exhibit 14.

36. Exhibit A to Movants' Exhibit 14.

37. Debtor's Exhibit G.

38. The record is unclear whether these companies were affiliated with Merrill Lynch or acting as trustees for succeeding bondholders, but that information is not essential.

39. Movants' Exhibits 26 through 28.

40. Notice of Default and Demand for Payment attached to Movants' Exhibit 34, Extension Agreement.

41. Debtor's Exhibit H, letter to Joe Ross dated December 8, 1992.

42. Debtor's Exhibit H, letter to The First Boston Corporation dated December 18, 1992.

43. Debtor's Exhibit H, letter to The First Boston Corporation dated February 10, 1993.

income of the hotel property, the only bond collateral remaining after RTC sold the FHLMC Certificates.[44] Although Alchemedes has purchased the bonds, the testimony establishes that RTC still holds them as collateral for financing it furnished Alchemedes for the purchase. There is, however, no evidence of the precise financing agreement between Alchemedes and RTC, nor is there evidence that the bond purchase is contingent on the successful eviction of KAR from the property.

## LEGAL POSITIONS

■  Alchemedes maintains that the Kansas statute governing revenue bonds gives this transaction the structure of a "true lease" from the City to the debtor that is governed by § 365 of the Code. Since § 365 requires the debtor to assume the lease and cure all its defaults if it wants to keep the hotel and reorganize, Alchemedes doubts that the debtor has the financial capacity to effect cure. In support of its classification of the transaction as a lease, Alchemedes relies on state law cases characterizing a Kansas revenue bond transaction as a "true lease," and a Kansas bankruptcy court decision holding that a lease under the Kansas revenue bond statute is indeed subject to § 365 of the Code. *In re Petroleum Products, Inc.*, 72 B.R. 739 (Bankr.D.Kan.1987), *affirmed*, No. 87–4127–R, slip op., 1988 WL 492079 (D.Kan. Nov. 21, 1988). The City and Security Bank, who are also represented by Alchemedes' counsel, join in this position, but they have relatively minor financial interest in the outcome compared to Alchemedes, either in dollar amount due them or priority of their claims.

The debtor dismisses *Petroleum Products* as wrongly decided. It believes that the question is exclusively one of federal law and that the state law cases that are the foundation of *Petroleum Products* are irrelevant to the classification issue. Debtor supports this view with revenue bond cases from other jurisdictions holding that the "economic substance" of the transaction controls in bankruptcy.[45] To the debtor, the structure of the revenue bond transaction should not be viewed as a lease but as a security agreement subject to restructuring under § 1129 of the Bankruptcy Code. In short, debtor believes that the true economic substance of the transaction makes it the owner of the hotel subject to the bondholder's lien, and that the hotel and its contents are property of the bankruptcy estate under § 541 of the Code. If this is so, the debtor might be able to restructure its bond obligation in Chapter 11 as it would any other secured claim. If successful, it could continue in business, a prospect which it argues is the overriding purpose of the Code to foster.

Debtor's reliance on the objectives of the Code to override state law is at the bottom of the controversy. It raises the troublesome question of when a bankruptcy court should depart from the doctrine of *Butner v. United States*, 440 U.S. 48, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979), by ignoring state law to advance the objectives of the Bankruptcy Code and broadens the inquiry to include the implications of *Erie R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), for bankruptcy reorganization.[46]

## CLASSIFICATION EFFECTS

Although this IRB transaction is composed of a "Lease," and its attendant "Indemnity Agreement," "Collateral Pledge Agreement," and "Assignment of Lease and Security

44.  Debtor's Exhibit I.

45.  *In re Central Foundry Co.*, 48 B.R. 895 (Bankr. N.D.Ala.1985); *In re Independence Village, Inc.*, 52 B.R. 715 (Bankr.E.D.Mich.1985); *In re PCH Associates*, 804 F.2d 193 (2d Cir.1986); *In re Opelika Manufacturing Corp.*, 67 B.R. 169 (Bankr.N.D.Ill.1986); *In re Pacific Express, Inc.*, 780 F.2d 1482 (9th Cir.1986); *In re Moreggia & Sons, Inc.*, 852 F.2d 1179 (9th Cir.1988); *International Trade Admin. v. Rensselaer Polytechnic Inst.*, 936 F.2d 744 (2d Cir.1991); *In re Hotel Syracuse, Inc.*, 155 B.R. 824 (Bankr.N.D.N.Y. 1993).

46.  Alfred Hill, *The Erie Doctrine in Bankruptcy*, 66 Harv.L.Rev. 1013 (1953); Vern Countryman, *The Use of State Law in Bankruptcy Cases (Part I)*, 47 N.Y.U.L.Rev. 407 (1972); Vern Countryman, *The Use of State Law in Bankruptcy Cases (Part II)*, 47 N.Y.U.L.Rev. 631 (1972); John Hart Ely, *The Irrepressible Myth of Erie*, 87 Harv.L.Rev. 693 (1974); John T. Cross, *State Choice of Law Rules in Bankruptcy*, 42 Okla.L.Rev. 531 (1989). -

Agreement," Alchemedes focuses primarily on the lease and § 365.

If the IRB transaction is viewed as a true lease, the hotel is not property of the bankruptcy estate and the transaction is subject to § 365 of the Code. Only the unexpired lease itself would be property of the estate.[47] Under § 365(a) and (b), if a revenue bond lease is an "unexpired lease," and the debtor wishes to keep the leasehold property, it must assume the lease. If it assumes the lease, debtor must cure any financial lease defaults; compensate or provide adequate assurance that it will promptly compensate the lessor for actual pecuniary loss resulting from the default; and provide adequate assurance of future performance under the lease. In addition, under § 365(d)(3) debtor must perform all its lease obligations arising after the order for relief. These obligations would be postpetition rent. Upon assumption of the unexpired lease, the landlord's claim for postpetition rent becomes an administrative expense entitled to full payment in cash when a plan of reorganization is confirmed. *See* 11 U.S.C. § 1129(a)(9)(A) and *In re Multech Corp.*, 47 B.R. 747 (Bankr. N.D.Iowa 1985).

If the revenue bond lease falls under § 365(a), debtor's reorganization effort is doomed. Indeed, probably all defaulted IRB reorganizations are doomed. The debtor would need sufficient funds to cure all prepetition defaults, to pay all lease obligations coming due from the petition date to the date of assumption of the lease,[48] and to pay all postpetition rent as an administrative expense. If this kind of money were available to the debtor, it would not have been forced into bankruptcy in the first place.

On the other hand, debtor takes a more global view of the transaction, one that considers the intent of all of the transaction documents.

If the revenue bond transaction is in reality a financing lease under which the debtor holds equitable title to the hotel and its contents, the facility is property of the bankruptcy estate under § 541. The debtor can remain in possession of the property while it attempts to work out a reorganization plan. Alchemedes' claim is a secured debt, rather than a rent claim. The amount of Alchemedes' secured claim is determined by the value of the property securing the claim. Once the secured claim is allowed in a liquidated amount, the debtor can use § 1129(b)(2)(A) to repay the claim with deferred cash payments having a present value equal to at least the allowed amount of the secured claim. The debtor is not facing an insurmountable administrative expense claim that it cannot pay on the effective date of its reorganization plan. And it need not make any postpetition payments, other than those necessary to adequately protect Alchemedes' interest in the hotel to the extent it might be impaired by the automatic stay. Since Alchemedes is undersecured, this is unlikely to be an insurmountable problem for the debtor. *United Savings Ass'n v. Timbers of Inwood Forest Associates, Ltd.*, 484 U.S. 365, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988).

Of course, the debtor must satisfy many other Code requirements to successfully reorganize, but Congress' grant of power to stretch out the payment of principal and interest on a secured claim is obviously the essence of reorganization law. This power is not for the debtor's benefit only, however. It also allows other holders of claims and interests to recover bankruptcy dollars if a plan can be confirmed and successfully consummated.

### KANSAS IRB LAW

Kansas decisional law takes a definite view of an IRB lease outside of bankruptcy. Although the Kansas cases were decided for

---

**47.** There is academic debate about whether the unexpired lease itself actually comes into the bankruptcy estate. *See* Michael T. Andrew, *Executory Contracts in Bankruptcy: Understanding "Rejection"*, 59 U.Colo.L.Rev. 845 (1988); and Jay Lawrence Westbrook, *A Functional Analysis of Executory Contracts*, 74 Minn.L.Rev. 227 (1989).

**48.** Some courts hold that postpetition rent obligations are entitled to "superpriority" and immediate payment, *e.g., In re Duckwall–Alco Stores, Inc.*, 150 B.R. 965 (D.Kan.1993).

purposes other than classifying leases under § 365 of the Bankruptcy Code, they uniformly hold that a lease executed under the revenue bond statute is a true lease, not a mortgage. *Misco Industries, Inc. v. Board of Sedgwick County Comm'rs,* 235 Kan. 958, 685 P.2d 866 (1984); *City of Lenexa v. Board of Johnson County Comm'rs,* 237 Kan. 782, 703 P.2d 800 (1985); *In re Petition of City of Moran,* 238 Kan. 513, 713 P.2d 451 (1986); *Mid–Central v. Board of Tax Appeals,* 13 Kan.App.2d 509, 774 P.2d 363 (1989); *Bank of Alton v. Tanaka,* 247 Kan. 443, 799 P.2d 1029 (1990).

In *Misco* and *City of Lenexa,* the Kansas Supreme Court held that for purposes of determining whether a party recording a notice of IRB lease had to pay the register of deeds a recording fee, the lease was not a mortgage and the fee did not have to be paid. *Moran* also held an IRB lease was not subject to the filing requirements of the Kansas Uniform Commercial Code. In *Mid–Central* the Kansas Court of Appeals distinguished between an IRB lease and a trust indenture and allowed the Register of Deeds to keep a recording fee charged for filing the indenture. Finally, in *Tanaka,* the Kansas Supreme Court found that a defaulting tenant under an IRB lease could be evicted and the lease was not an equitable mortgage subject to being foreclosed.

■ In the spirit of *Butner v. United States,* 440 U.S. 48, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979), two Kansas bankruptcy decisions have adopted the Kansas case law in deciding the precise question now before this Court. *In re Petroleum Products, Inc.,* 72 B.R. 739 (Bankr.D.Kan.1987), *affirmed,* No. 87–4127–R, slip op. (D.Kan. Nov. 21, 1988). Judge Rogers affirmed Chief Bankruptcy Judge Pusateri's ruling that the case law declaring Kansas revenue bond leases to be "true leases" controlled; consequently, § 365 was operative.[49] If this body of Kansas case law applies here, this transaction must be declared subject to § 365. But, there is other law, federal and state, that might apply to the question in the bankruptcy context.

### OTHER LAW

Referring to § 365, *Collier on Bankruptcy* says, "To preclude any uncertainty as to whether a lease is an executory contract and questions of the applicability of the law of executory contracts to leases, section 365 refers to both 'executory contracts' and 'unexpired leases' except where reference to only one or the other is appropriate." 2 *Collier on Bankruptcy* ¶ 365.02, at 365–15 to 365–16 (15th ed. 1994) (footnotes omitted). The Code, however, does not define the terms "executory contract" or "unexpired lease" found in § 365.

The following legislative history under § 365 adopts a simplified version of the Countryman view of the meaning of "executory contract":

> Subsection (a) of this section authorizes the trustee, subject to the court's approval, to assume or reject an executory contract or unexpired lease. Though there is no precise definition of what contracts are executory, it generally includes *contracts on which performance remains due to some extent on both sides.* A note is not usually an executory contract if the only performance that remains is repayment. Performance on one side of the contract would have been completed and the contract is no longer executory.

11 U.S.C. § 365 Notes of Committee on the Judiciary, Senate Report No. 95–989 (emphasis added).

**49.** Movants incorrectly contend that this Court is bound by Judge Rogers' decision in *Petroleum Products.* In *Campbell v. Hoffman,* 151 F.R.D. 682, 684 (D.Kan.1993), Judge Rogers stated: "While this court is bound to follow the dictates of the Tenth Circuit, we are not required to follow the decisions of other district judges. See *Threadgill v. Armstrong World Industries, Inc.,* 928 F.2d 1366, 1371 (3rd Cir.1991)." Chief Judge Pusateri in *In re American Freight,* No. 88– 41050–11, Adv. No. 90–7436 (Bankr.D.Kan. Sept. 27, 1991) (Pusateri, J.), stated: "With regard to the movants' suggestion this Court should feel constrained to follow the decisions of one of the district judges in this district, the Court notes the Third Circuit recently declared that the decisions of one district judge in a district are not binding on the other district judges in that district. *Threadgill v. Armstrong World Industries, Inc ....* " *Id.* at 4.

Further relevant legislative history appears under § 502(b)(7), now (6),[50] referring to the effect of termination of a "lease of real property." This background distinguishes between the concept of a "true lease" and a "financing lease" of real property.

As used in section 502(b)(7), the phrase "lease of real property" applies only to a "true" or "bona fide" lease and does not apply to financing leases of real property or interests therein, or to leases of such property which are *intended as security.*

Historically, the limitation on allowable claims of lessors of real property was based on two considerations. First, the amount of the lessor's damages on breach of a real estate lease was considered contingent and difficult to prove. Partly for this reason, claims of a lessor of real estate were not provable prior to the 1934 amendments to the Bankruptcy Act. *Second, in a true lease of real property, the lessor retains all risk and benefits as to the value of the real estate at the termination of the lease.* Historically, it was, therefore, considered equitable to limit the claims of a real estate lessor.

However, these considerations are not present in "lease financing" transactions where, in substance, the "lease" involves a sale of the real estate and the rental payments are in substance the payment of principal and interest on a secured loan or sale. In a financing lease the lessor is essentially a secured or unsecured creditor (depending upon whether his interest is perfected or not) of the debtor, and the lessor's claim should not be subject to the 502(b)(7) limitation. Financing "leases" are in substance installment sales or loans. The "lessors" are essentially sellers or lenders and should be treated as such for purposes of the bankruptcy law.

Whether a "lease" is true or bona fide lease or, in the alternative, a financing "lease" or a lease intended as security, depends upon the circumstances of each case. *The distinction between a true lease and a financing transaction is based upon the economic substance of the transaction*

*and not, for example, upon the locus of title, the form of the transaction or the fact that the transaction is denominated as a "lease".* The fact that the lessee, upon compliance with the terms of the lease, becomes or has the option to become the owner of the leased property for no additional consideration or for nominal consideration indicates that the transaction is a financing lease or lease intended as security. In such cases, the lessor has no substantial interest in the leased property at the expiration of the lease term. In addition, the fact that the lessee assumes and discharges substantially all the risks and obligations ordinarily attributed to the outright ownership of the property is more indicative of a financing transaction than of a true lease. The rental payments in such cases are in substance payments of principal and interest either on a loan secured by the leased real property or on the purchase of the leased real property. See, e.g., Financial Accounting Standards Board Statement No. 13 and SEC Reg. S–X, 17 C.F.R. sec. 210.3–16(q) (1977); cf. *First National Bank of Chicago v. Irving Trust Co.,* 74 F.2d 263 (2nd Cir.1934); and Albenda and Lief, "Net Lease Financing Transactions Under the Proposed Bankruptcy Act of 1973," 30 Business Lawyer, 713 (1975).

11 U.S.C. § 502 Notes of Committee on the Judiciary, Senate Report No. 95–989 (emphasis added).

Commenting of this legislative history, *Collier on Bankruptcy* states:

The legislative history makes absolutely plain that the phrase "lease of real property" in section 502(b)(6) applies only to a true or *bona fide* lease and does not apply to financing leases of real property or interest in real property or to leases of such property which are intended as security.

3 *Collier on Bankruptcy* ¶ 502.02, at 502–63 (15th ed. 1994).

The *Irving Trust* case referred to above in the legislative history quotation is a decision under the 1898 Bankruptcy Act holding a

---

**50.** Present Code § 502(b)(6) was originally § 502(b)(7). Thus, the legislative history under original § 502(b)(7) applies to current § 502(b)(6).

lease to be a financing lease and refusing to treat the bondholder's claim as rent. In *Irving Trust,* the bankrupt was the owner and landlord of six parcels of real property which were leased to different parties. It wanted to improve the properties but, for some unexplained reason, it did not want to obligate itself directly for the funds to make the improvements. To remain disguised, it assigned the six leases to its employee, Wolfson. Wolfson sublet back five of the leased properties to the bankrupt in a blanket sublease. Wolfson then issued mortgage bonds to the public for $450,000.00, agreeing to give the bondholders a mortgage on the leases he held as assignee and on his reversionary interest in the blanket sublease. As sublessee, the bankrupt agreed to pay Wolfson rent under the blanket sublease and to perform all the covenants of the sublease that had been assigned by Wolfson to the mortgagee. The bankrupt's rent payments were in the same amount as the bond payments that Wolfson was to pay, but they were not called rent in the blanket sublease document. The bondholder's trustee made a claim against the bankruptcy estate, and the referee and lower court held the claim was for rent and reduced it under the then prevailing law. Looking past the structure of the transaction, the Second Circuit reversed, holding that the bondholder's claim was not rent, but an absolute debt allowable in full.

A more recent Code decision is *In re Winston Mills, Inc.,* 6 B.R. 587 (Bankr.S.D.N.Y. 1980), in which Judge Babitt also adopted the economic substance rule after analyzing whether two leases were bona fide or financing leases. Like the case at bar, *Winston* involved revenue bonds secured by the leases, but the question was whether the rent claims under the leases should be limited by § 502(b)(7), now (6), of the Code. After extensive analysis of the documents making up the IRB transaction, Judge Babitt concluded that the leases involved were financing leases intended as security for installment sales and thus not subject to any limitation applicable to a landlord's damage claim.

While *Winston* involved real property in part, unlike *Irving Trust* it also involved personal property. Therefore, Judge Babitt

relied in part on state law in his analysis, citing the Tennessee version of the Uniform Commercial Code, Tenn.Code Ann. § 47–9–102(2), which makes Article 9 applicable to leases intended as security.

Of course, Kansas has essentially the same law under its version of the U.C.C., K.S.A. § 84–9–102(2), and the Kansas courts have applied it to find that a lease is in truth a security agreement, albeit not in the context of an IRB lease. *E.g., Atlas Industries, Inc. v. National Cash Register Co.,* 216 Kan. 213, 531 P.2d 41 (1975); *CIT Financial Services, Inc. v. Gott,* 5 Kan.App.2d 224, 615 P.2d 774 (1980). In addition, the Kansas courts have developed equitable principles that would support a finding that a lease of real property pendent to an IRB issue is an equitable mortgage rather than a true lease. *E.g., Yost v. Guinn,* 106 Kan. 465, 188 P. 427 (1920); *Dyer v. Johnson,* 109 Kan. 338, 198 P. 944 (1921); *Coryell v. Hardy,* 144 Kan. 194, 58 P.2d 1151 (1936).

Several observations flow from *Irving Trust* and *Winston.* These cases exemplify the "economic substance" approach that courts have used in dealing with disguised financing arrangements. While *Winston* discusses state law, it does not depend on state law in finding the leases under consideration were financing leases.

Since the abbreviated definition of executory contract in the legislative history is not expressly tied to state law, the implication is that Congress had a federal rule of decision in mind for classifying what is or is not such a contract. The reasoning of *Irving Trust* is silent on whether state or federal principles control the decision. Since neither *Irving Trust* nor the legislative history mentions state law as providing the rule of decision, Congress may have intended a federal rule be applied when it cited the Financial Accounting Standards and *Irving Trust* in support of the idea that the economic substance of the lease transaction controls.

Finally, the failure of the Code to define "executory contract" or "unexpired lease" leaves the Court free to determine what transactions should be classified under the headings, unless it must not apply state law.

It is also notable that while the Kansas courts have chosen in litigation outside of bankruptcy to call a lease connected with an IRB issue a "true lease," they could have decided otherwise under legal principles well established in Kansas law had they been facing a different question. The purposes for which the Kansas courts have made their IRB rulings are distinct from the purposes being addressed in this case. Since bankruptcy is the exclusive province of the federal court, the Kansas courts have never faced the question presented here, and as an original matter, they never will. But if Kansas courts did face the same question, we cannot be sure they would select the same legal principles they used in the IRB cases to decide whether § 365 of the Bankruptcy Code controls this transaction. If they could be presented with the question inside bankruptcy, rather than outside bankruptcy, the Kansas courts might select U.C.C. or equitable mortgage principles as the rule of decision. In that context, their decision might be different from that which caused them to use pure lease principles in the IRB lease cases.

It follows that even if this Court is *Butner*-bound to use state law, it could select equitable mortgage principles to control the decision, rather than lease principles, if the factual pattern of the transaction supports such a ruling. The factual pattern in this case is remarkably similar to that in *Winston* and many other cases that have found an IRB lease to be a financing lease rather than a true lease as the following analysis supports.

### FINANCING LEASE

The Private Placement Memorandum dated February 23, 1983, covering solicitation of the partnership units provides: "The security for the industrial revenue bonds will be collateral supplied by Anchor Savings Association ('Anchor') pursuant to its collateral Pledge Agreement in favor of the City and in consideration of the assignment of the lease between KAR and the City to Anchor." [51]

The Offering Statement dated April 7, 1993, covering the issuance of the bonds, states, "The principal security for the Series 1983 Bonds will be provided by a pool of Eligible Collateral pledged by the Association...." [52] The primacy of this pledged collateral is further reflected in the following language:

> Although the City's interest in the Project pledged as security for the benefit of the Bondholders constitutes significant security for payment of the Series 1983 Bonds, as a practical matter, it would be resorted to only if the Fiscal Agent is prevented from enforcing the pledge of, and its security interest in, the Pledged Collateral or if the Pledged Collateral proved to be insufficient in order to pay, either in accordance with their terms or by earlier redemption as herein described, the Series 1983 Bonds in their entirety, the interest thereon and any applicable redemption premium.... [53]

The Offering Statement also explains that the Collateral Pledge Agreement provides a mechanism for the collateral pledged by Anchor to be used periodically to pay the principal and interest on the Bonds. [54]

In order to protect Anchor in the event its marketable securities were actually called upon to pay principal and interest on the bonds, KAR and Anchor entered into a "Reimbursement Agreement" calling for KAR to repay Anchor for any monies so used. [55] To provide security for Anchor, KAR executed an "Assignment of Lease and Security Agreement" which granted Anchor a leasehold mortgage on the subject property. [56]

Considerable evidence was adduced to prove that, although one document in the transaction is in the form of a "lease", the transaction in substance is a financing arrangement consisting of many documents which, when viewed together, reflect an intent to create a security agreement as defined in the Code.

51. Offering Information attached to Movants' Exhibit 5, at 2.

52. Movants' Exhibit 12 at 15.

53. Movants' Exhibit 12 at 20.

54. Movants' Exhibit 12 at 17.

55. Movants' Exhibit 10.

56. Movants' Exhibit 8.

610

Title to the property is formally vested in the City, which is a requirement of the industrial revenue bond statute. But KAR's "lease" is coupled with an option of purchase [57] and the City is prohibited from selling the property.[58]

The intent of the parties to the transaction was to provide a "financing" of KAR's project. The City did not intend to actually serve as a landlord, and KAR did not intend to be a mere tenant or renter. The City never professed to act as a landlord; it never checked on the property or assumed any of the other normal roles of a property owner. The evidence shows that the City maintains fixed asset schedules of the property it "owns," yet the hotel property is not on that list, even though the City is the title holder. Even though the "lease" payments were in default for a considerable time, the City did not institute any formal proceedings or take any self-help actions to evict KAR. Clearly, KAR considers itself as much the beneficial owner as the City considers itself the legal title holder. In this vein, Section 3.02 of the KAR Limited Partnership Agreement provides that:

[E]quitable, or legal and equitable title to, and the respective rights and interests in and to, the Project, including, without limitation, the parcels of land on which the Project will be situated (hereinafter referred to as the "Land"), the buildings and all other improvements, fixtures, equipment and tangible property of the Partnership to be located therein or thereon (hereinafter referred to as the "Improvements"), and all contracts, leases, licenses, insurance policies, plans, specifications, reports, easements, rights of way, surveys, security deposits, and other tangible or intangible properties, rights, assets, documents or interests related to the Land or the

Improvements, shall be registered in the name of, and held by, the Partnership or held for the benefit of the Partnership.[59]

The fact that the so-called lease payments are really debt service payments is clear from the documents. The "lease" payments are calculated to retire the debt in a manner similar to the repayment of a loan.[60] The payments under the "lease" are *not* based on any notion of the reasonable fair market rental rate of the subject property and are *not* calculated to compensate the City of Olathe for its purported fee ownership of the property. If the bondholder would agree to a reduction in the interest rate on the bonds, the "lease" payments would go down. In fact, in 1987 the bondholder did consent to a change in the repayment terms of the bonds, and the "lease" payments were reduced accordingly.[61] The Deferral Agreement even refers to the revised "lease" payments as "debt service payments." [62]

In the event the facility is destroyed by fire, tornado or other casualty, KAR is still required to make "lease" payments.[63] The "lease" recites that it is a "net lease" and, further, that if the rent due under the "lease" is insufficient, for any reason, to pay the principal and interest payments due under the bonds, then KAR will pay the extra amount necessary to pay the bonds according to schedule.[64]

Any equity built up from the initial investment by the KAR partners, appreciation, or pay down of principal on the bonds would inure directly to the benefit of KAR and not the City or the bondholders. The mechanism for entitling KAR to equity in the property is the option which allows KAR to purchase the property for the sum of $100 plus the bond debt.[65]

Furthermore, the economics of the transaction were such that everyone expected that

57. Movants' Exhibit 7, Section 17, at 28.

58. Movants' Exhibit 7, Section 5.3, at 18.

59. Limited Partnership Agreement of KAR Development Associates attached to Movants' Exhibit 12, at 7.

60. Movants' Exhibit 7, Section 2.1, at 6.

61. Movants' Exhibits 14 and 15.

62. Movants' Exhibit 14, para. 3, at 2.

63. Movants' Exhibit 7, Section 2.4, at 8.

64. Movants' Exhibit 7, Section 28.1, at 44.

65. Movants' Exhibit 7, Section 17.2, at 29.

KAR would exercise the option and become the fee simple title holder. The KAR partners had put up substantial equity[66] and substantial appreciation was anticipated. Thus, the Private Placement Memorandum used to market the KAR limited partnership interests contains a projection showing the economic effect on the partnership of a sale of the hotel in 1989 for $14.6 million, with the equity going to KAR and its partners.[67] Everyone who testified on the subject acknowledged that it was the intention of all parties at the outset that the purchase option would be exercised and KAR would obtain formal legal title.

As to the burdens of ownership, the "lease" places all responsibility on KAR. None of the burdens are imposed on the City, even those obligations that would normally rest with the owner in a rental situation. KAR is responsible for all "impositions" relating to the property.[68] All ad valorem taxes are to be paid by KAR.[69] All payments in lieu of taxes are to be paid by KAR.[70] Casualty and liability insurance coverage must be provided by KAR.[71] KAR is required to provide the City of Olathe with a policy of owner's title insurance in the sum of $6 million.[72] KAR is required to provide Anchor with a "leasehold mortgagee's policy of title insurance in the amount of $6,000,000 insuring the lien of Anchor created by the Assignment of Lease on the leasehold estate...."[73] KAR is responsible for all repairs and maintenance, including roof, exterior walls, and structural components in addition to the routine items.[74] KAR must pay all utilities.[75] KAR is required to indemnify the City against all liabilities resulting from the property.[76] The City has absolutely no exposure and is responsible for nothing since, in addition to all of KAR's other obligations under the "lease," KAR agreed to reimburse the City for any and all obligations incurred by the landlord under the "lease."[77]

The history of the property and KAR's exercise of dominion over it further demonstrates that, in substance, KAR is at least the *equitable owner* of the property. The KAR partners selected the site and purchased the real property. Later they conveyed *legal* title to the City as part of the industrial revenue bond transaction. KAR can alter the facility without the consent of the City so long as it does not affect the intended use or structural integrity of the property.[78] KAR can make additional improvements on the land without the City's permission.[79]

The "lease" provides that KAR agrees to enter into all instruments "necessary for perfection of and continuance of the perfection of the security interest of Landlord in the property hereby leased."[80] This certainly recognizes some form of ownership in KAR; if the City were the real and only owner, it would not need to be granted a security interest in the property.

Anchor held an assignment of the "lease" as security for the monies it would be owed if the marketable securities it pledged to the bondholder were used to pay the bonds.[81] After KAR's default, RTC as successor to Anchor bought the bonds from the bondholder, sold the Anchor collateral, and sold the

---

66. Debtor's Exhibit F; Movants' Exhibit 5, at 7; and Movants' Exhibit 12, at 20.

67. Movants' Exhibit 5, Schedule F.

68. Movants' Exhibit 7, Section 5.1, at 17.

69. Movants' Exhibit 7, Section 5.5, at 18.

70. Movants' Exhibit 7, Section 5.6, at 19.

71. Movants' Exhibit 7, Section 6.1, at 19.

72. Movants' Exhibit 7, Section 6.2, at 21.

73. Movants' Exhibit 7, Section 6.2, at 21.

74. Movants' Exhibit 7, Section 9.1, at 23.

75. Movants' Exhibit 7, Section 13.1, at 27.

76. Movants' Exhibit 7, Section 14.1, at 27.

77. Movants' Exhibit 7, Section 31.6, page 47.

78. Movants' Exhibit 7, Section 10.1, at 25.

79. Movants' Exhibit 7, Section 11.1, at 26.

80. Movants' Exhibit 7, Section 32.3, at 49.

81. Movants' Exhibit 8.

bonds to Alchemedes. The "lease" assignment was reassigned to Alchemedes.[82]

It is clear that Alchemedes is the real "movant" in these proceedings to lift the stay. Both the fiscal agent bank and the City of Olathe acknowledge that, with respect to whatever amounts KAR might owe them, they have a lien on the hotel which is ahead of Alchemedes' and that there is enough equity to adequately secure the debts owed to them. In addition, they each acknowledge that Alchemedes has indemnified them from any liability which results from their participation with Alchemedes in the involuntary bankruptcy petition.

Alchemedes claims that it owns the bonds and is the holder of the "lease" assignment.[83] Reference to the "Assignment of Lease and Security Agreement" shows that it contemplates a debtor/creditor mortgage-type relationship between Anchor (now Alchemedes through RTC) and KAR. The default provision of the assignment talks of foreclosure and waiver of redemption.[84] The language in the assignment relating to *"Bankruptcy"* contemplates adequate protection-type remedies, not relief from the stay and eviction.[85] Other than the vesting of naked title in the City, any aspects of real ownership by the City are invisible in the transaction, and it is clear that KAR is the beneficial owner of the property and not merely the tenant.

Treatment of the "lease" (and related documents) according to its substance not its form is consistent with its treatment in other contexts. For both federal and Kansas income taxes purposes, the lease is disregarded under the doctrine of substance over form.[86] Under federal and Kansas tax law, KAR is treated as the owner of the property and cannot deduct as "rent" the payments which the "lease" denominates as "rent." Rather, KAR is required to break down the so-called rent payments into their *principal* and *interest* components. It then deducts the interest but not the principal. KAR also deducts *depreciation* on the property as an owner would do.

As the analysis shows, viewed from the perspective of the legislative history, the lease executed under the ordinance along with the Collateral Pledge Agreement, the Reimbursement Agreement, and the Assignment of Lease and Security Agreement is not a "true" lease. The inescapable conclusion is that using the principles of analysis suggested in the legislative history under § 502(b)(7), the lease is only part of a transaction that was intended to be a security agreement.

From the outset, the bondholder was the real party to be protected in this project. Collateral in the form of FHLMC certificates was pledged as primary security for the bonds, backed up by the hotel itself. Except for the fact that it granted some tax relief to further its purposes of promoting commerce within its boundaries and increasing its tax base, the City has no ongoing interest in the hotel. It is a mere title holder for security purposes and Security is a mere functionary. The parties most benefitted are the bondholder and KAR, and Alchemedes has now succeeded to the bondholder's position. As in *Irving Trust* and *Winston Mills*, there is no doubt that the parties' intent within this elaborate series of agreements was to secure the bond debt, not to enter into a traditional lease agreement. The factual pattern in *In re Petroleum Products, Inc.*, 72 B.R. 739 (Bankr.D.Kan.1987), *affirmed*, No. 87–4127–R, slip op. (D.Kan. Nov. 21, 1988), was similar to that here and the court conceded there, notwithstanding its holding against the debtor, that the lease was factually a financing lease. There is no doubt that the factual pattern here supports a finding that this transaction is a financing lease rather than a true lease for the reasons given.

## FEDERAL LAW

■ According to Alchemedes, the Court must apply state law in determining whether a lease should be treated as a mortgage. Another view of the question is whether the

---

**82.** Movants' Exhibit 8.

**83.** Movants' Exhibit 8.

**84.** Movants' Exhibit 8, para. 9, at 6.

**85.** Movants' Exhibit 8, para. 16, at 11.

**86.** Movants' Exhibit J.

whole transaction (which encompass the IRB Lease, the Reimbursement Agreement, the Collateral Pledge Agreement, and the Assignment of lease and Security Agreement) is a "security agreement" as the term is defined under the Bankruptcy Code. Alchemedes supports its proposition with the legislative history of § 101(51) [87] and the well-known pre-Code case of *Butner v. United States,* 440 U.S. 48, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979). Before *Butner,* however, there was *Erie R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). A look at its influence on bankruptcy is in order.

In a much cited 1953 law journal article,[88] Alfred Hill examines the equity power of bankruptcy courts to override state law after *Erie R. Co. v. Tompkins,* using as a frame of reference for his study bankruptcy cases in which courts had subordinated the claims of wrongdoers state law notwithstanding. Cases like Deep Rock, *Taylor v. Standard Gas & Electric Co.,* 306 U.S. 307, 59 S.Ct. 543, 83 L.Ed. 669 (1939), were the focus. Hill's purpose was to determine the "extent to which the equity power of the bankruptcy courts may be employed to defeat state-created rights." Hill at 1013.

Hill concluded that since *Erie* rested in part on the Rules of Decision Act,[89] which had traditionally been understood to apply in non-diversity as well as diversity cases, the *Erie* doctrine applied in bankruptcy. This principle has become settled doctrine and, while *Butner* does not mention *Erie,* it undoubtedly flows from it. Hill also negated the idea that non-diversity jurisdiction gave a court greater power.

> From this point of view it is essentially irrelevant whether federal jurisdiction is based on diversity of citizenship or not. The fact that a suit arises under a law of the United States does not mean that all the issues for decision are federal issues; and nowhere is this more true than in bankruptcy. In fact the Supreme Court has recognized the application of *Erie* in a non-diversity setting, as have many of the lower courts, including courts sitting in bankruptcy.

Hill at 1033–34 (footnotes omitted).

Commenting on when a federal court can appropriately use federal common law, Hill stated:

> If the Congress is powerless to intervene in areas which have been reserved to the states, so too are the federal courts. The constitutional doctrine of limited powers is applicable to both alike. Only in the fulfillment of a constitutional or congressional policy are the federal courts free to apply an overriding federal substantive law.

> It has been made clear, however, that the federal courts are not to shrink from applying a "federal common law" in "those areas of judicial decision within which the policy of the law is so dominated by the sweep of federal statutes that legal relations which they affect must be deemed governed by federal law having its sources in those statutes, rather than by local law." But always the limits of the authority of the federal courts to make substantive law are the limits of the federal policy being executed.

Hill at 1033 (footnotes omitted).

Further acknowledging the limits of the bankruptcy power Hill states:

> Despite the demonstrated capacity for growth and adaptation which is inherent in the bankruptcy power, and the resulting difficulty of definition, it is clear that there are some things the bankruptcy court can-

---

87. Alchemedes' legislative history reference under § 101(51) is actually found under the legislative history to § 101(44) and reads in part, "Whether a consignment or a lease constitutes a security interest under the Bankruptcy Code will depend on whether it constitutes a security interest under applicable State or local law." (H.R.Rep. No. 595, 95th Cong., 1st Sess. 314 (1977); S.Rep. No. 989, 2d Sess. 26 (1978).)

88. Alfred Hill, *The Erie Doctrine in Bankruptcy,* 66 Harv.L.Rev. 1013 (1953).

89. Section 1652 of Title 28, United States Code, reads, "The laws of the several states, except where the Constitution or the treaties of the United States or acts of Congress otherwise require or provide, shall be regarded as rules of decision in civil actions in the courts of the United States, in cases where they apply." The original version of this statute contained the words "trials at common law" in place of the words "civil actions."

not do because they have nothing to do with bankruptcy. For example, though the chief liability of the bankrupt is thought to be his wife, the bankruptcy court cannot strike at the root of his financial troubles by granting him a divorce—and it is unlikely that Congress, under the bankruptcy power, could authorize the court to do so. Thus the bankruptcy power is restricted not only by other provisions in the Constitution, such as the Due Process Clause, but also by limitations inherent in the nature of bankruptcy itself. It is primarily such limitations which must be considered in any study of the extent to which the bankruptcy power warrants the overriding of state law.

Hill at 1037–38.

After noting these limitations on the bankruptcy power, Hill reviewed federal equity decisions before and after *Erie* and concluded that "the source of the power to override state-created substantive rights in bankruptcy must now be found within the limits of the bankruptcy power and not in 'general equitable principles' considered apart from permissible bankruptcy objectives." Hill at 1036. According to Hill's thesis, then, there is power in a bankruptcy court to carry out bankruptcy objectives. Such power may override state law under certain circumstances, but that power is not found in the equity power of the bankruptcy court. It is not the scope of equity, but the scope of bankruptcy that must be considered in deciding when the court can override state law. To a degree, this concept is seen in those cases limiting the bankruptcy court's powers under § 105 when it is asked to grant equity in a way that conflicts with express mandates of the Bankruptcy Code. *In re Wood,* 87 B.R. 170 (Bankr.D.Kan.1988); *In re Rashid,* 97 B.R. 610 (W.D.Okla.1989). *See also* 19 Charles Alan Wright et al., *Federal Practice and Procedure,* § 4513 (detailing the decline of the federal equitable-remedial rights doctrine in diversity cases after *Erie* ).

Applying his conclusion to the cases in his study, Hill found that the bankruptcy objective of equality of distribution served to allow the courts to apply federal law in the context of insolvency where the acts of a claimant created equities in other claimants.

> It would therefore seem to be a safe working hypothesis that, in pursuance of the bankruptcy objective of equality of distribution, the bankruptcy court is free to apply overriding federal law in determining the consequences of acts of a claimant which created equities in other claimants of a character having relevance only in the context of distribution in insolvency.

Hill at 1039–40.

> It is preeminently in the formulation of uniform rules of distribution in insolvency that bankruptcy supersedes state law. The person who claims in bankruptcy submits himself to the jurisdiction of the bankruptcy court to resolve certain equities among the claimants which have special relevance in the context of distribution in insolvency.

Hill at 1046.

For his final conclusion, Hill suggests:

> It is now clear that the federal courts may make substantive law only in effectuation of a policy derived from the Constitution or from a valid act of Congress. The exercise of non-diversity jurisdiction cannot expand their powers in this respect.
>
> In bankruptcy this means that the power to override state law can be determined only by reference to bankruptcy objectives. No doubt simpler and better tests may be available than have been suggested in this study of the Deep Rock cases; but in view of the amorphous nature of bankruptcy it is difficult to perceive how bankruptcy objectives may be defined with any precision save in relation to particular problems. Once the bankruptcy objectives are defined in a given situation, the equity jurisdiction of the bankruptcy courts affords a flexible and effective instrument for attaining them.

Hill at 1050.

Bankruptcy objectives, then, must be defined on a case-by-case basis. Once they are so defined, they become the source of the power to override state-created substantive rights, and "general equitable principles" provide the vehicle for the federal court to

advance bankruptcy objectives. As will become apparent, *Butner* is an application of this rule to circumstances where there is no articulated bankruptcy objective advanced as a reason for overriding the use of state law.

■ When *Butner*, 440 U.S. 48, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979), came upon the scene, it reflected what had happened in *Erie*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), and furnished an example of Hill's conclusion that unless a bankruptcy objective could be identified, equity would not be allowed to create federal common law. *Butner* is often cited for the proposition that "[p]roperty interests are created and defined by state law." 440 U.S. at 55, 99 S.Ct. at 918. But it goes on to say, "Unless *some federal interest requires a different result,* there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding." *Id.* (Emphasis added.)

When the Supreme Court granted certiorari in *Butner*, it said, speaking through Justice Stevens, "Our concern is with the proper interpretation of the federal statutes governing the administration of bankrupt estates." *Id.* at 51, 99 S.Ct. at 916. The issue involved a mortgagee's entitlement to postpetition rents. More specifically, the question was whether or not the Court would continue to allow some federal courts to apply a federal rule of equity "that affords the mortgagee a secured interest in the rents even if state law would not recognize any such interest until after foreclosure." *Id.* at 53, 99 S.Ct. at 917.

Justice Stevens acknowledged that Congress had the Constitutional authority to pass a statute defining the mortgagee's interest in the rents and profits earned by property in a bankruptcy estate. He pointed out, however, that while the 1898 Bankruptcy Act contained "provisions invalidating certain security interests as fraudulent, or as improper

preferences over general creditors ... Congress has generally left the determination of property rights in the assets of a bankrupt's estate to state law." *Id.* at 54, 99 S.Ct. at 917–18 (footnote omitted). In other words, because the 1898 Bankruptcy Act did not address the question of a mortgagee's entitlement to rents, state law would provide the rule of decision and the federal courts could not use a rule of equity. Justice Stevens said of the courts that had used a rule of equity, "The minority of courts which have rejected state law have not done so because of any *congressional command,* or because their approach serves any *identifiable federal interest.* Rather, they have adopted a uniform federal approach to the question of the mortgagee's interest in rents and profits because of their perception of the demands of equity." *Id.* at 55, 99 S.Ct. at 918 (emphasis added). By rejecting this rule of equity approach because there was no conflict with a Congressional command or identifiable federal interest to justify its use, the Court held that state law on the mortgagee's interest in rents would apply.[90] Since there was no federal interest to be advanced, the federal courts could not fashion an equitable rule that displaced state law.

■ Thus, *Butner* permits federal courts to reject state law as the rule of decision when it conflicts with an "identifiable federal interest" or "Congressional command." When this is done federal common law is being applied by a federal court.

Further light is shed on the federal common law making process by Wright et al., *Federal Practice and Procedure,* § 4514, at 223 (1982). For our purposes, the focus is on the "second" situation enumerated below:

Although categorization is always a risky business, it is possible to make the broad statement that federal common law has

---

**90.** Footnote 9 is further support for this reading of the case:

"The Federal Constitution, Article I, § 8, gives Congress the power to establish uniform laws on the subject of bankruptcy throughout the United States. In view of this grant of authority to the Congress it has been settled from an early date that state laws to the extent that they conflict with the laws of Congress,

enacted under its constitutional authority, on the subject of bankruptcies are suspended. While this is true, state laws are thus suspended only *to the extent of actual conflict with the system* provided by the Bankruptcy Act of Congress. *Sturges v. Crowninshield,* 4 Wheat. 122 [4 L.Ed. 529 (1819)]; *Ogden v. Saunders,* 12 Wheat. 213 [212] [6 L.Ed. 606 (1827)]."
*Id.* at 54, 99 S.Ct. at 918 (emphasis added.)

been developed in three contexts. The three are not mutually exclusive; any particular exercise of the power may involve two or all of them. Nonetheless, the three are somewhat distinct analytically, and they do provide a structure for evaluating the cases.

*First,* there are those situations involving "significant conflict between some federal policy or interest and the use of state law." ... *Second,* there are those "areas of judicial decision with which the policy of the law is so dominated by the sweep of federal statutes that legal relations which they affect must be deemed governed by federal law." This category embraces situations in which Congress or the Constitution has not provided a rule of decision for the resolution of a federal question case that is properly within the subject matter jurisdiction of the federal courts. Concomitantly, congressional or constitutional intent can be inferred that the federal courts should supply the necessary rule of decision by pronouncing common law to fill the interstices of a pervasively federal framework. *Third,* and finally, there are cases involving federal common law in areas in which there is a strong national or federal concern.

(Emphasis added) (footnotes omitted).

Later at pages 236 and 236, the text refers back to the "second" situation where federal common law is made:

As was noted earlier in this section, the *second* broad category of cases in which federal common law presently operates comprises those cases in which federal courts are called upon to pronounce common law to fill the interstices of a pervasively federal framework. The need for interstitial lawmaking arises as a consequence of the practical impossibility of making any statute completely comprehensive and comprehensible—of anticipating and providing for in full detail, in terms sufficiently well defined to leave no need for interpretation, the rules for every case

to which the statute subsequently will be applied. The scope of this species of lawmaking power lies along a continuum that varies inversely with the completeness of the legislative scheme and the clarity of the congressional intent. At one end of the continuum there is the simple necessity of filling in the interstices in a federal statutory scheme—for example, by *construing vague statutory terms,* supplying omitted procedural rules, or determining claims and defenses that may be asserted when the elements of a statutory cause of action have been set out in general terms. This is the most prevalent and well recognized form of federal common—law power and examples can be found in cases arising under or with issues governed by nearly all federal statutes.

*Id.* at 235–36 (emphasis added) (footnotes omitted).

This case is different from *Butner* because there are "bankruptcy objectives ... defined ... in relation to [this] particular problem" [91] such that the court must fill in "the interstices in a federal statutory scheme" [92] by deciding whether this transaction is included or excluded from the meaning of statutory terms. "[V]ague statutory terms"—"unexpired lease"—exist which must be construed to fill "in the interstices in a federal statutory scheme." [93] This is one of those "area[s] of judicial decision within which the policy of the law is so dominated by the sweep of federal statutes that legal relations which they affect must be deemed governed by federal law...." [94]

The area of judicial decision is dominated by the sweep of a federal bankruptcy statute with the objective of fostering reorganization, as the following Supreme Court language on the subject of property of the estate indicates:

In proceedings under the reorganization provisions of the Bankruptcy Code, a troubled enterprise may be restructured to enable it to operate successfully in the future. Until the business can be reorga-

---

91. Hill at 1050.

92. Wright et al. at 235 (1982).

93. Wright et al. at 235–36 (1982).

94. Hill at 1033.

nized pursuant to a plan under 11 U.S.C. §§ 1121–1129 (1976 ed., Supp. V), the trustee or debtor-in-possession is authorized to manage the property of the estate and to continue the operation of the business. See § 1108. By permitting reorganization, Congress anticipated that the business would continue to provide jobs, to satisfy creditors' claims, and to produce a return for its owners. H.R.Rep. No. 95–595, p. 220 (1977). Congress presumed that the assets of the debtor would be more valuable if used in a rehabilitated business than if "sold for scrap." *Ibid.* The reorganization effort would have small chance of success, however, if property essential to running the business were excluded from the estate. See 6 J. Moore & L. King, Collier on Bankruptcy ¶ 3.05, p. 431 (14th ed. 1978). Thus, to facilitate the rehabilitation of the debtor's business, all the debtor's property must be included in the reorganization estate.

*United States v. Whiting Pools, Inc.,* 462 U.S. 198, 203, 103 S.Ct. 2309, 2312–13, 76 L.Ed.2d 515 (1983).

As stated earlier, the question is essentially whether the hotel is property of the estate under § 541. The reality of the transaction is that the debtor is in substance, but not in form, the owner of the hotel which is being held as security for the debt through the mechanism of a lease with an option to purchase.

The design of the Kansas IRB statute commits the income of the hotel constructed with revenue bond proceeds to repay the bonds over time. To secure the bondholder, the city retains title to the facility and leases it to the developer. Under the statute, the structure of the transaction is not unlike an installment loan contract commonly known as a "contract for deed." In the contract for deed situation, title remains in the seller/lender, but a deed is delivered into escrow until the purchaser/borrower completes making the contract payments. The escrow agent has the power to pass title when all the payments are completed. The whole purpose of the legal structure is to provide security for the seller/lender, but the courts recognize the equity position of the buyer who is the owner of the property for all practical purposes. See *In re Booth,* 19 B.R. 53 (Bankr.D.Utah 1982); *In re Fahnders,* 66 B.R. 94 (Bankr.C.D.Ill.1986); *In re Bertelsen,* 65 B.R. 654 (Bankr.C.D.Ill.1986); *In re Rehbein,* 60 B.R. 436 (9th Cir. BAP 1986); *In re Thurmond,* 46 B.R. 723 (D.Or.1985). The essential difference under the IRB statute is that the city holds title to the facility until the payments are made to the bondholder, then delivers title when the borrower exercises its purchase option for a nominal consideration.

In this instance, the magnitude and complexity of the financial arrangements suggest that Congress, had it spoken specifically to the question, would have classified this transaction as a secured claim for reorganization purposes. But because the legal structure is created by state statute and enforced by state courts in other contexts, Alchemedes argues that the arrangement does not conflict with bankruptcy objectives. It makes this argument, however, without discussing the interests of other parties to the case.

Alchemedes, the City, Security, and KAR are not the only interested parties in this case. The schedules list 99 unsecured claims totalling $142,590.63. Three creditors other than movants hold four secured claims totalling $1,852,788.64. Interest holders number 26. The hotel also employs a number of persons, although the evidence does not specify how many. All of these parties have an interest in this reorganization effort which will be forfeited if there can be no reorganization. See *Pioneer Inv. Services v. Brunswick Associates,* ——— U.S. ———, ———, 113 S.Ct. 1489, 1495, 123 L.Ed.2d 74 (1993) stating, "Chapter 11 provides for reorganization with the aim of rehabilitating the debtor and avoiding forfeitures by creditors."

In those instances where defaults in IRBs occur outside of bankruptcy, a reorganization is worked out and the bonds are refunded as permitted by the statute. K.S.A. § 12–1749a. In such situations, general creditors are left to their state law remedies against the debtor who in this instance would have no part in the workout. This means that the general creditors would be looking to a debtor with no means to reorganize and thus no

ability to pay their claims. Surely, this is what will happen if Kansas IRB law is applied in this case. But if the debtor is allowed to go forward and is lucky enough to be successful in its reorganization effort, the holders of general unsecured claims may receive some payment through the plan,[95] to say nothing of the possible benefits for the hotel employees and equity interest holders.

In order to go forward with the reorganization, debtor must have the power to deal with the bondholder's claim as a secured claim under § 1129(b)(2)(A) of the Code rather than being forced to meet the requirements of § 365.

This Court believes that the purposes and objectives of the Bankruptcy Code and Chapter 11 of promoting reorganization furnish a sufficient federal interest in seeing to it that if a workout is possible, all of the creditors of the debtor participate in the reorganization plan. The objectives of the Code in general and § 1129 of Chapter 11 in particular provide an "identifiable federal interest" that justifies overlooking state law in the context of this revenue bond financing transaction.

### STATE LAW NOT AFFECTED

In *Petroleum Products,* the court expressed concern that if state law were not followed, the bonds would lose their tax free status. *In re Petroleum Products, Inc.,* 72 B.R. 739 (Bankr.D.Kan.1987), *affirmed,* No. 87–4127–R, slip op., 1988 WL 492079 (D.Kan. Nov. 21, 1988). Certainly, this Court has no power to change state law and its ruling here should not be taken as having any such effect. By disregarding state IRB law in deciding this bankruptcy question, the Court does not change or affect how state law will be administered in the future. This is beyond this Court's power to do. The state courts will still treat IRB leases as "true leases" outside of bankruptcy, and outside of bankruptcy, cities and counties will still have the remedy of eviction against an IRB tenant. For bankruptcy purposes, however, this Court will treat Kansas IRB lease transac-

tions with factual patterns like this one as secured claims, unless, of course, this decision is reversed.

This Court has considered the impact of this decision which applies federal law on this industrial revenue bond transaction and on future such transactions. The Court finds that this decision in favor of KAR will not upset expectations of parties to existing transactions, will not deter future transactions, and is not inappropriate in the specific case of the KAR transaction.

There is no clearly established authority upon which bondholders can rely to show that this transaction is impervious to the restructuring process of Chapter 11. There is, however, authority from other jurisdictions having similar laws supporting the ability of a debtor to reorganize an analogous "lease" agreement in Chapter 11. *In re Central Foundry Co.,* 48 B.R. 895 (Bankr. N.D.Ala.1985); *In re Independence Village, Inc.,* 52 B.R. 715 (Bankr.E.D.Mich.1985); *In re PCH Associates,* 804 F.2d 193 (2d Cir. 1986); *In re Opelika Manufacturing Corp.,* 67 B.R. 169 (Bankr.N.D.Ill.1986); *In re Pacific Express, Inc.,* 780 F.2d 1482 (9th Cir. 1986); *In re Moreggia & Sons, Inc.,* 852 F.2d 1179 (9th Cir.1988); *International Trade Admin. v. Rensselaer Polytechnic Inst.,* 936 F.2d 744 (2d Cir.1991); *In re Hotel Syracuse, Inc.,* 155 B.R. 824 (Bankr.N.D.N.Y. 1993).

Overriding the strict remedy of eviction if the "tenant" goes into Chapter 11 bankruptcy will not emasculate any purpose sought by the City at the outset of the transaction. The purpose of the issuing authorities in existing transaction has already been accomplished by the hotel having been built and operated. The Mayor and the City Manager of Olathe each testified that the purpose of the bond transaction has been accomplished by the building and operation of the hotel by KAR.

The City officials testified that a decision allowing bankruptcy reorganization of an revenue bond "lease" would not hinder the

**95.** Bankruptcy permits creditors to share equally when their debtor is insolvent. The schedules show the debtor to be insolvent in the bankruptcy sense (liabilities exceeding assets by almost $5 million), and the evidence shows it to be insolvent in the equity sense (debtor is not paying its debts as they become due).

City in issuing bonds in the future and the bond lawyers who testified acknowledged that it would have no effect on their ability to provide the same bond opinions as they had in the past.

The parties stipulated that the Johnson County Register of Deeds, who was subpoenaed but was excused, would have testified that even if the Court holds that the "lease" should be treated as a mortgage for the purposes of Title 11, she will continue to record such documents as leases under Kansas law without imposing a mortgage registration tax, unless she is instructed differently by an opinion of the Attorney General of Kansas.

The fact that the Internal Revenue Service and the Kansas Department of Revenue treat the industrial revenue bond "lease" as a mortgage is a signal to all parties that there are instances when the "lease" form of the transaction will be disregarded. The Touche Ross tax opinion accompanying the partnership private placement offering documents [96] notes that the "lease" would be disregarded for income tax purposes, that KAR would be considered the owner of the facility, and the "lease" would be treated as a debt instrument.

Those lawyers who issue legal opinions regarding the enforceability of the documents in IRB transactions, including the lease, do so for the issuer/city, the bond underwriters, and the developer/tenant. Those attorneys have regularly "carved out" bankruptcy and insolvency proceedings from their enforceability opinions. Their opinions specifically provide that there are no assurances of enforceability of a "lease" according to its terms in the event of bankruptcy. The legal opinions in the KAR case provided as follows:

Gaar & Bell, issuer's counsel, noted in its April 7, 1983, opinion: [97]

We are further of the opinion that the Ordinance has been duly adopted, that the Lease has been duly authorized, executed and delivered by the parties thereto ...

and that the obligations set forth in the Ordinance and the Lease are legally enforceable in accordance with their terms, *except as enforcement thereof may be limited by bankruptcy, insolvency or other laws affecting the enforcement of creditors' rights* and except that certain of the remedial provision [sic] of the Ordinance and the Lease may be unenforceable in whole or in part; provided, however the inclusion of such provisions does not, in our opinion, affect the validity of the Ordinance or the Lease.

(Emphasis added.)

Smith, Gill, Fisher & Butts, KAR's counsel, noted in its April 7, 1983 opinion to the City of Olathe.[98]

(2) The Lease ... and the Assignment of Lease ... have each been duly authorized by the Company, have each been duly and properly executed and delivered by the duly authorized general partners in the Company, and are valid and binding agreements of the Company, enforceable in accordance with their respective terms *(except insofar as the enforceability thereof may be limited by any applicable bankruptcy, insolvency, moratorium, reorganization or other laws of general application affecting remedies or creditors' rights).*

(Emphasis added.)

Smith, Gill, Fisher & Butts, KAR's counsel, noted in its April 7, 1983, opinion to Anchor: [99]

(4) The Agreement and the Related Documents to which KAR is a party have been signed, sealed, and, if appropriate, acknowledged by duly authorized partners of KAR and each constitute legal, valid and binding obligations of KAR, enforceable in accordance with their respective terms *(except insofar as the enforceability thereof may be limited by any applicable bankruptcy, insolvency, moratorium, reorgani-*

---

96. Movants' Exhibit 5.

97. Debtor's Exhibit C at 5.

98. Debtor's Exhibit D, Letter to City at 1–2.

99. Debtor's Exhibit D, Letter to Anchor at 2.

*zation or other laws of general applicability affecting remedies or creditor's rights).*

(Emphasis added.)

Polsinelli, White, Vardeman & Shalton, attorney for the issuer in the 1987 changes to the transaction, noted in its May 20, 1987, opinion to the bondholder: [100]

(5) The Documents have been duly authorized in accordance with the provisions of the Lease Agreement, the First Assignment of Lease and Security Agreement, the Ordinance and constitute the valid and binding obligation of the parties to the Documents and are enforceable in accordance with their terms, *except to the extent that their enforceability may be limited by (i) bankruptcy, insolvency, reorganization, moratorium and other similar laws affecting creditors' rights which are not in existence or hereafter enacted; and (ii) the discretion of any court before which any enforcement proceeding may be brought to deny or limit the remedy of specific performance or to grant other equitable relief with respect to contractual obligations.*

(Emphasis added.)

The evidence of the supposed harm that would befall the bond system if IRBs were reorganizable in bankruptcy is unpersuasive. It consists of a concern that if the eviction remedy is taken away by bankruptcy, the marketability of the bonds would be harmed. The Court is unconvinced for several reasons. There is no evidence that bond purchasers rely on the strict remedy of eviction. Bond purchasers expect legal opinions to be issued by one or more law firms.[101] All bond transaction opinions contain statements that in a bankruptcy case, the parties cannot rely on the "lease" being enforceable according to its terms. A red flag has been present in all IRB issues, but it has had no apparent effect.

Prior to the 1987 decision in *Petroleum Products,* there were no decisions from Bankruptcy Courts from the District of Kansas on how the IRB lease would be treated in bankruptcy. Before 1987, however, there was significant use of the IRB statute; in fact, the pre–1987 period marks the most prevalent use of IRBs.[102] The extensive use of IRBs when there was no authoritative decision on the bankruptcy treatment of the "lease" suggests its irrelevance in the market.

Alchemedes called Mr. Dennis Mitchell of the investment banking firm of Piper Jaffrey as an expert witness on the marketing of revenue bonds. Mr. Mitchell's firm participates as an underwriter for such bond issues, but neither he nor the firm were employed for the KAR transaction.

The substance of Mr. Mitchell's testimony is that a decision adverse to the movants would increase the risk to which the revenue bonds are subject and therefore increase the interest rate offered with the bonds. While this may be so, the Court finds that it is insufficient reason to deny debtor, interest holders, employees, and unsecured creditors the opportunity to participate in a bankruptcy reorganization.

Although Mr. Mitchell declared that offering statements prepared for bondholders in Kansas IRB transactions do not address bankruptcy,[103] such is apparently not the case. Debtor's Exhibits K and L are examples of two IRB issues of the City of Olathe, Kansas, in which Mr. Mitchell was involved for the underwriter. They disclose the risk that in bankruptcy, the "leases" may not be enforceable according to their terms. Mr. Mitchell felt that it would be difficult to market IRBs if the various bond lawyers could not tell purchasers how the IRB "lease" would be treated in bankruptcy.[104] This record shows, however, that the bond lawyers universally advise parties to the transaction that they cannot state whether the "lease" will be enforceable according to its terms in the event of bankruptcy, although Mr. Mitchell did not know that.[105] Thus, what Mr. Mitchell thinks may chill the

---

100. Debtor's Exhibit E at 2.

101. Partial transcript of trial held May 19, 20, 1994 ("Mitchell Transcript" at 52–54.

102. Mitchell Transcript at 72, 103.

103. Mitchell Transcript at 86.

104. Mitchell Transcript at 58–59.

105. Mitchell Transcript at 56–57, 60–61.

market has actually been occurring regularly in the marketplace—apparently with no ill effect since investors buy IRBs even in the face of opinions that they may not be enforceable according to their terms in bankruptcy.[106]

Nor will overriding the eviction remedy in bankruptcy change any existing use, or for that matter the contemplated future use, of the remedy of eviction outside of bankruptcy. Witnesses for both parties were all asked whether they had ever had experience with or knowledge of a transaction where the eviction remedy had actually been used outside of bankruptcy. No one knew of any previous use of the eviction remedy. Overriding an unused remedy will cause no harm. This is especially so with respect to credit-enhanced transactions. Dennis Mitchell noted that in a credit-enhanced deal, the remedy of eviction is not relevant because the risk is transferred to the credit enhancer.[107] Mr. Mitchell further acknowledged that the remedy of eviction would not have been important at all to the bondholder here since $7.5 million in marketable securities had been pledged to secure the bonds.[108]

Mr. Mitchell felt that a bankruptcy court decision treating the IRB lease like a debt in bankruptcy, as opposed to a true lease, would hurt the marketability of *non-credit-enhanced* IRBs.[109] However, Mr. Mitchell's testimony shows no foundation in fact or in the marketplace for his concerns. Mr. Mitchell could not recall any discussions he actually had with potential bond investors about their risk analysis in investing in the bonds, especially with respect to the eviction right.[110] Mr. Mitchell has never had a conversation with a prospective bondholder in which he was told that it was important that the bondholder retain the remedy of eviction in a bankruptcy proceeding and that the

bondholder not be subject to the provisions of § 1129 of the Bankruptcy Code.[111] He could not tell the Court of anyone in any IRB transaction in Kansas during the last 10 years that he thought might have entered into a transaction or felt more comfortable because they knew what would happen to an IRB transaction in bankruptcy.[112] He has never opined to anyone that the IRB "lease" is enforceable according to its terms in a bankruptcy.[113] If an investor were interested in knowing about the enforceability of the "lease" according to its terms in a bankruptcy, Mr. Mitchell would refer the inquirer to one of the bond attorneys.[114] It is undisputed that if such an inquiry were made, the attorneys would not be able to advise how the "lease" would be treated in bankruptcy. Mr. Mitchell does not know how the "lease" would be treated in bankruptcy and does not know whether the bondholder who buys the bonds knows what would happen in a bankruptcy.[115] Mr. Mitchell seems to feel that treatment of an IRB "lease" in bankruptcy as a debt would be a significant problem, yet he does not know how that treatment would affect any of the parties to the proceeding. Mr. Mitchell does acknowledge, however, that if the bondholders would get the fair market value of the property through a bankruptcy, they probably would not be harmed as compared to an out-of-bankruptcy solution.[116]

Any suggestion that the market relies on the availability of the eviction remedy is untenable. The ultimate goal of the bondholder is to be repaid all of the bond debt or as much as can be paid from the value of the facility. In a bankruptcy case, the bondholder will be paid the full value of the facility; outside a bankruptcy case and after an eviction, the bondholder will still only receive the value of the collateral—whether it achieves

**106.** Mitchell Transcript at 66–67.

**107.** Mitchell Transcript at 47.

**108.** Mitchell Transcript at 54–55, 117–118.

**109.** Mitchell Transcript at 29–31.

**110.** Mitchell Transcript at 22.

**111.** Mitchell Transcript at 49–50.

**112.** Mitchell Transcript at 155.

**113.** Mitchell Transcript at 67–68.

**114.** Mitchell Transcript at 69.

**115.** Mitchell Transcript at 71, 102.

**116.** Mitchell Transcript at 112.

that value by a sale or a refinancing of the property.[117] Since the ultimate payoff to the bondholder in the event of a default is the same in either instance, the application of the bankruptcy remedy is unlikely to harm the marketability of the bonds.

### ·CONCLUSION

To summarize, this contested matter is about how the bondholder's claim should be classified and treated under Chapter 11 of the Bankruptcy Code and about whether the subject hotel is reorganizable property of the bankruptcy estate rather than the separate property of the bondholder.

If the bondholder's claim is classified as rent under an "unexpired lease," the requirements of § 365 and the magnitude of the claim foreclose reorganization. If the claim is classified as secured bond debt rather than rent, restructuring of the claim is at least a possibility.

Under the doctrine of *Butner v. United States,* 440 U.S. 48, 55, 99 S.Ct. 914, 918, 59 L.Ed.2d 136 (1979), "[p]roperty interests are created and defined by state law" and a bankruptcy court must follow such law "unless some federal interest requires a different result."

But when this Court looks for guidance on whether the rule of decision for classifying the claim is one of state or federal law, the legislative history is cloudy and the Code does not define the term "unexpired lease." By referring to Financial Accounting Standards and the pre-*Erie* case of *Irving Trust,* however, the legislative history implies that the rule of decision may be a federal one since *Irving Trust* does not apply state law and the Financial Accounting Standards do not suggest state law.

■ If under *Butner,* the rule of decision must be drawn from state law, however, this Court would select well established Kansas legal principles viewing the debtor as the equitable owner of the hotel and the lease as an intended financing lease giving rise to bond debt, not rent under a true lease, albeit

other Kansas decisions have interpreted IRB leases as "true leases" in a different context. Such a selection is justified because the question here is different from that· which faced the Kansas courts in their IRB decisions.

*Butner* is distinguishable from this case because federal interests are present here as grounds for applying a federal rule of decision to the question.

Bankruptcy power flows from Congressional command and identifiable federal interest. When there is such a command or interest in a particular case, a bankruptcy court can advance that interest with its equitable powers, as Alfred Hill's article shows. The Bankruptcy Code and Chapter 11 are a pervasively federal framework that embodies identifiable federal interests, among ˙ them fostering reorganization of troubled companies, avoiding forfeitures by general creditors of the debtor, and distributing an insolvent debtor's property ratably among unsecured claim holders. When a federal court makes a rule of decision to fill the interstices of such a pervasively federal framework, it is making federal common law. According to Wright et al., *Federal Practice and Procedure,* § 4514 at 235–36 (1982):

> The need for interstitial lawmaking arises as a consequence of the practical impossibility of making any statute completely comprehensive and comprehensible—of anticipating and providing for in full detail, in terms sufficiently well defined to leave no need for interpretation, the rules for every case to which the statute subsequently will be applied. The scope of this species of lawmaking power lies along a continuum that varies inversely with the completeness of the legislative scheme and the clarity of the congressional intent. At one end of the continuum there is the simple necessity of filling in the interstices in the federal statutory scheme—for example, by *construing vague statutory terms* .... This is the most prevalent and well recognized form of federal common-law power and examples can be found in cases arising

---

117. Although Mr. Mitchell suggested that a landlord, after evicting a tenant from an IRB property that had a value of $2.8 million, could lease the property to a third party at a rental based on an assumption that the property was worth $6 million, the Court disregards that opinion.

under or with issues governed by nearly all federal statutes.

This Court construes the vague statutory term "unexpired lease" not to include the "Lease," "Reimbursement Agreement," "Collateral Pledge Agreement," and "Lease Assignment and Security Agreement" generated under the Kansas Economic Development Bond Act in the bond transaction at issue. Looking past form to substance, the Court finds that the intent of the parties was to create a financing lease and bond debt, not rent under a true lease. In reality, KAR is the equitable owner of the hotel under a security agreement with the original bondholder, now Alchemedes, the successor bondholder.

Under the circumstances of this case, federal interest of advancing the objectives of Chapter 11 and the Bankruptcy Code override Kansas state law to allow the debtor an opportunity to reorganize and to protect the rights of all interested parties to participate in the reorganization effort. The Court holds that Alchemedes' claim is not for rent but for bond debt and that § 365 does not apply to this transaction. The hotel is property of the bankruptcy estate, subject to the restructuring prerequisites of the Code. Alchemedes' claim is secured bond debt subject to § 1129(b)(2)(A) treatment. The Kansas IRB statute allows for refinancing bond debt outside of bankruptcy; there is every reason to believe it can be done best inside bankruptcy.

Since this transaction was intended as security and the bond debt is classified as a secured claim, the Court orders that the hotel revenues are cash collateral subject to Alchemedes'˙ security interest under § 363. Accordingly, Alchemedes is entitled to adequate protection of its security interest in such cash collateral. Debtor shall not use such revenues without Alchemedes' consent until such time as the Court can hear evidence on whether Alchemedes' lien is adequately protected. This order applies as well to Security Bank's claim as fiscal agent which derives from Alchemedes' bond claim and is also secured.

While the claim of the City of Olathe has been mentioned in this contest, the City's interests have not been the real focus and are not seriously at risk. The City's only real claim is for past due "payments in lieu of taxes" which are also secured by the hotel. To the extent that the City has interests that are unresolved, they are deferred for later argument.

Finally, this decision does not change state law and is effective for bankruptcy reorganization purposes only.

The motion for relief from stay is denied.

The foregoing discussion shall constitute findings of fact and conclusions of law under Fed.R.Bankr.P. 7052 and Fed.R.Civ.P. 52(a) as incorporated for contested matter by Fed. R.Bankr.P. 9014.

IT IS SO ORDERED.

### JUDGMENT

Alchemedes/Olathe Inn Limited Partnership ("Alchemedes"), the City of Olathe, Kansas ("City"), and Security Bank of Kansas City ("Security") filed their joint motion for relief from the automatic stay on November 5, 1993. Success on the motion for stay relief depends on the legal classification of an industrial revenue bond transaction involving the parties. The issue for decision is whether Alchemedes' claim is for rent under a lease arising from a revenue bond transaction or whether in reality it is a secured claim subject to restructuring in Chapter 11 because it arises from a security agreement as defined by the Bankruptcy Code. The underlying question is whether the hotel is property of the bankruptcy estate and thus available for reorganization.

The parties presented evidence on May 19, 20, and 23, 1994. Debtor KAR Development Associates, L.P., appeared by its attorneys, R. Pete Smith and Jonathan A. Margolies of the firm of McDowell, Rice & Smith, P.C., Kansas City, Missouri. Alchemedes/Olathe Inn Limited Partnership, the City of Olathe, and Security Bank of Kansas City (collectively "the movants") appeared by their attorneys, Mark A. Shaiken and Cindi S. Woolery of the firm of Stinson, Mag & Fizzell, Kansas City, Missouri. David W. Queen of the firm

of Gilmore & Bell, Kansas City, Missouri, also appeared for the City of Olathe, Kansas.

Based on the Memorandum Opinion entered in this proceeding, the Court finds that Alchemedes' claim is not for rent but for bond debt and that § 365 does not apply to this transaction. The hotel is property of the bankruptcy estate, subject to the restructuring prerequisites of the Code. Alchemedes' claim is secured bond debt subject to § 1129 treatment. The Kansas IRB statute allows for refinancing bond debt outside of bankruptcy; there is every reason to believe it can be done best inside bankruptcy.

Since this transaction was intended as security and the bond debt is classified as a secured claim, the Court orders that the hotel revenues are cash collateral subject to Alchemedes' security interest under § 363. Accordingly, Alchemedes is entitled to adequate protection of its security interest in such cash collateral. Debtor shall not use such revenues without Alchemedes' consent until such time as the Court can hear evidence on whether Alchemedes' lien is adequately protected. This order also applies to Security Bank's claim as fiscal agent which derives from Alchemedes' bond claim and is also secured.

While the claim of the City of Olathe has been mentioned in this contest, its interests have not been the real focus and are not seriously at risk. The City's only real claim is for past due "payments in lieu of taxes" which are also secured by the hotel. To the extent that the City has interests that are unresolved, they are deferred for later argument.

Finally, this decision does not change state law and is effective for bankruptcy reorganization purposes only.

The motion for relief from stay is denied.

IT IS SO ORDERED.